IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CLEVELAND FIREFIGHTERS FOR        )
FAIR HIRING PRACTICES, *et al.*,   )        CASE NO.  1:00 CV 301
                                   )        CASE NO.  C73-330
          Plaintiffs,              )
                                   )        JUDGE DONALD C. NUGENT
     v.                            )
                                   )
CITY OF CLEVELAND, *et al.*,       )        <u>MEMORANDUM OPINION</u>
                                   )
          Defendants.              )

**************************************

LAMONT C. HEADEN, *et al.*,        )
                                   )
          Plaintiffs,              )
                                   )
     and                           )
                                   )
VANGUARDS OF CLEVELAND,            )
                                   )
          Intervenor Plaintiffs,   )
                                   )
     v.                            )
                                   )
CITY OF CLEVELAND, *et al.*,       )
                                   )
          Defendants.              )

This case is before the Court on remand from the Sixth Circuit Court of Appeals. The Sixth Circuit reviewed the Court's denial of an extension of an amended consent decree that included race-based hiring quotas as a remedy for past discrimination by the City of Cleveland in the hiring of firefighters. While not expressing disagreement with the Court's conclusion, the Sixth Circuit vacated the decision and remanded the case for further specific findings addressing the question of "whether 31 years out,[1] the consent decree's racial classifications continue to remedy past discrimination by the City's Fire Department." *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, No. 09-4208, at 3 (6th Cir. January 27, 2012).

## Procedural Background

This case has an incredibly long history and the underlying facts and procedural history have been stated and re-stated in a myriad of opinions over the course of the last thirty-nine years. This case was originally filed in 1973 as a class action discrimination suit brought by Lamont Headen and other minority residents of the City of Cleveland who applied for, but were not offered employment as firefighters in the Cleveland Fire Department. The suit was brought against the City of Cleveland and other named defendants. Discrimination was alleged to have been perpetuated by:

    (a)    Written tests used as a prerequisite for employment exclude a disproportionately high number of minority applicants for employment as compared to the [w]hite applicants and have not been professionally developed nor validated to establish any predictive validity evidence that the tests measure job performance;

    (b)    The background investigation and oral interviews exclude a disproportionately high number of minority applicants for employment as compared to [w]hite applicants because:

---

[1] At this point the case has been under Court supervision for over thirty-nine years.

      (I)      factors are used to deny employment to minority persons which are
not related to job performance;

      (ii)     arbitrary discretion is vested in the Defendants to decide whether or
not to employ an applicant; this arbitrary discretion has been used by
the Defendants to deny employment to a high proportion of minority
applicants as compared with [w]hite applicants.

  (c)     The psychological examinations are conducted by means of a written
examination which discriminates against minority applicants and which fails
to take into account the differing cultural experiences of minority applicants
as compared to [w]hite, largely middle-class applicants. Individuals are
eliminated for "psychological" reasons which are not job related.

  (d)     The medical examination excludes a disproportionately high number of
minority applicants for reasons not related to the medical and physical
requirements of the job of fireman.

Plaintiffs in the original action later filed an Amended Complaint, and a Second Amended

Complaint, adding allegations that the Safety Director improperly implemented a "one in three"

rule to refuse employment to minorities in violation of 42 U.S.C. §§ 1981, 1983 and O.R.C. §

4112.02.

In 1975, the Honorable Robert B. Krupansky conducted an evidentiary hearing in the

case.  He found that the entrance exam administered until that time was identical to an entrance

exam for patrolman/patrolwoman that had already been held to be unconstitutional in the case of

*Shield Club v. City of Cleveland*, Civil Action No. C7201088.  He also found that the other

allegations were "intimately interwoven as a practical matter with the administration of the

entrance examination" and bore a "similar likeness to the issues fully litigated and determined"

in the *Shield Club* case.  Judge Krupansky then ordered that there be developed an entrance exam

which is demonstrably job-related and consistent with EEOC Guidelines; a plan for recruitment

of minorities to take all subsequent examinations; a method of awarding City of Cleveland

-3-

residents bonus points for their residency on future examinations; and revised screening procedures that are job-related, objective, and non-discriminatory. *Headen v. City of Cleveland*, No. C73-330 (N.D. Ohio Apr. 25, 1975).

In 1976, the case was transferred to the Honorable Judge John M .Manos. In 1977 Judge Manos approved and adopted a consent order developed by the parties to address the discrimination found by Judge Krupansky in his April, 1975 Order. Part of the original consent decree provided that the City of Cleveland would implement a hiring ratio wherein the ratio of minorities to non-minorities who were hired could not be less than the ratio of minorities to non-minorities who passed the entrance exam during any given testing period. Following the adoption of this decree, the Vanguards of Cleveland, an organization of minority firefighters, intervened as Plaintiffs. In 1984 the consent decree was amended, although the remedial provisions remained essentially the same.

In 2000, the City of Cleveland moved to stay further execution of the consent decree. Also in 2000 an organization calling itself Cleveland Firefighters for Fair Hiring Practices ("CFFHP") brought a lawsuit challenging the constitutionality of the consent decree, and in particular, the race-based hiring ratios called for in the decree. *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, 1:00 CV 301 (consolidated with *Headen v. City of Cleveland*, No. C73-330). In response, the Vanguards alleged that the City had continued to discriminate against minorities. The City denied these allegations. Following these developments, Judge Manos approved an additional amendment to the consent decree. This second amendment recognized that the percentage of minority firefighters in the City's fire department had increased from 4% at the inception of the original lawsuit, to 26% in the year

-4-

2000. Judge Manos then ordered that the hiring ratios set forth in the1977 consent decree be increased to require that one out of every three new hires into the department be a minority applicant. This new ratio was to be implemented either until 33 and a third percent of firefighters were minorities, or for three hiring cycles. The three hiring cycles were to be completed by September 29, 2008. The Order setting forth this requirement also recognized, however, that "there may be legitimate circumstances which may prevent" the City from reaching this hiring goal. In that event, the second amended consent decree contemplated that the City could petition for a "reasonable extension of time" and that such an extension would be approved if "the City has made a good faith effort" to meet the deadline. (ECF #22).

The 2000 amended consent decree also recognized that the parties agreed to negotiate and implement a plan for "reinvigoration of the prior recruitment and training records" for the entry level position of firefighter, "in a manner that will be focused upon by City residents," and to institute a new program, funded by the City of Cleveland, which will focus on teaching high school students to become skilled in abilities required to perform well on the fire entrance exams. (ECF #22). These programs were to be made available to persons of all races. (Ex.13; ECF # 33-1).

The decree outlined some guidelines as to how the entrance exams should be scored and weighted, with equal weight being given to the written exam and the physical agility test so long as the *Headen* decree was in place.(ECF #22 at 4-9). The entrance examination process was also to be reevaluated no later than January 1, 2008 with special attention being given to the validity of the written and physical exams, their relative weights, and possible alternative methods of selection to insure merit-based hiring and to avoid discrimination on the basis of race or gender.

-5-

*Id.* Any changes that were warranted were not to be implemented until after the expiration of the *Headen* decree. *Id.*

In September of 2008, this case was reassigned once more to the currently presiding Judge. On September 26, 2008, only three days before the expiration of the 2000 amended consent decree, the City sought an extension of time in which to reach the 33 and a third percent minority hiring goal and/or to complete the three hiring cycles contemplated by the 2000 amended consent decree. (ECF #44). The City had been unable to reach the hiring goals of the 2000 amended consent decree due to budget issues and a reduction in the number of firefighters who voluntarily retired from the Department. The Vanguards also petitioned for an extension of the 2000 amended consent decree citing the City's inability to hire as previously contemplated, and alleging that the City had failed to reevaluate the examination process. (ECF #45). Although the Court allowed the parties additional time to brief all of the issues raised by the requests for extension, in the end the Court did not extend the 2000 amended consent decree. Therefore, the 2000 amended consent decree expired by its own terms own terms on September 29, 2008. (ECF #22).

During the briefing period, the CFFHP opposed the requested extension, alleging that extensive changes to the testing procedures, as well as the duration of the consent decree, had eliminated any need for further adherence to the race-based ratios contained in the 2000 amended consent decree. (ECF #50). The CFFHP did not oppose a continuation of the terms relating to future test advertising and recruitment, or requiring consultation efforts relating to the composition of future tests and test scoring procedures. The CFFHP also alleged that the minority make-up of the Cleveland Fire Department had come in line with the racial make-up of

-6-

the City's general work pool and regulations for minority hiring in other professions. (ECF #53).

In May of 2009, this Court held a hearing wherein the parties submitted evidence in the form of witnesses and exhibits. (ECF #62). Following the hearing all parties were to submit additional briefing at the request of the Court addressing the issue of whether an extension of the 2000 amended consent decree was necessary to advance its purpose. The parties did not address this question either at the evidentiary hearing or through any subsequent briefs. Instead, they submitted a proposed agreement that would extend the 2000 amended consent decree until the end of 2014. The Court called a status conference and informed the parties that the proposed stipulation was unacceptable and granted them leave to file a new proposal. If the parties did not submit a new proposed stipulation, the Court indicated that it would rule on the pending motions. (ECF #68). The Vanguards filed a status report indicating that they would not change their position on the proposed stipulation. (ECF #70). No other parties filed any additional documents.

The Court, after considering all of the arguments, briefing, evidence, and relevant law, concluded that the consent decree was meant to be a temporary solution to increasing minority access to and involvement in the hiring opportunities with the Cleveland Fire Department. It also found that the 2000 amended consent decree had outlasted its usefulness, and that no further judicial supervision over the consent decree was appropriate. Therefore, the Court denied the requests to extend the 2000 amended consent decree, and the expiration of the decree, which occurred on September 29, 2008 was never altered. The parties appealed this decision to the Sixth Circuit, which vacated and remanded the case for further factual findings, specifically:

-7-

whether the racial classifications contained in the 2000 amended consent decree continue to remedy past discrimination by the Cleveland Fire Department.

On remand, the Court ordered the parties to brief this issue, and submit any supporting evidence they may have.  An evidentiary hearing was held on December 19, 2012, and the parties filed supplemental briefs following the hearing. (ECF #95, 96, 97, 98).

### Factual Findings

There have now been in this case two evidentiary hearings, and multiple briefings including evidentiary submissions aimed at addressing whether a continuation of the consent decree is appropriate in this case.  This opinion most often focuses on the 2000 amendment to the consent decree as it sets forth the most recent terms of agreement.  However, the case must be viewed with the understanding that the discrimination at issue was found by Judge Krupansky in 1975 and the first consent decree was established in 1977.  Judge Krupansky's Order did not impose any race-based hiring ratios.   A race-based hiring ratio was included in the 1977 consent decree requiring that the number of minority hired be proportional to the number of minority who passed the entrance exam.  This requirement remained the same in the 1984 amendment.  In 2000 the race-based hiring ratios were altered to require that one of every three hires must be a minority until the specified ratio or number of hiring cycles was achieved.  This race-based hiring requirement is the primary focus of this opinion.  The parties have been provided more than ample opportunity to submit evidence in support of their respective positions, and each party has had the chance to address the Court's concern regarding whether the consent decree continues to serve its original purpose or whether it has been rendered unconstitutional by the change in circumstances over the last thirty-nine years.

-8-

In the 1970s when this case was filed and a consent decree was originally put in place, minorities accounted for only 4% of the firefighters in the Cleveland Fire Department. The Judge who originally reviewed the case made the finding that this incredibly low representation was caused by the City's discriminatory hiring practices, especially with regard to the content and scoring of the entrance exam. The evidence shows that by the year 2000, twenty-six percent of the Cleveland firefighters were minorities. That ratio has remained substantially the same to this date. (Dec. 19, 2012 Tr. at 86).

As the Court articulated in its prior opinion, the 2009 hearing yielded substantial evidence that the City of Cleveland has extended its best efforts to achieve the hiring goals set forth in the 2000 amended consent decree. There was also substantial evidence produced during the 2009 hearing that showed all parties have used their best efforts to produce substantial change with regard to increasing minority recruitment and hiring opportunities within the Fire Department, and that they did, in fact, succeed in creating increased opportunities for minorities who are interested in and qualified for a position in the Cleveland Fire Department. (Dec. 19, 2012 Tr. at 145-47). The evidence also shows that the recruitment and education of minorities, including efforts to inform and prepare individuals interested in applying for firefighter positions, has been equal to or has exceeded the recruitment and education efforts aimed at potential non-minority candidates.    In the documents supporting the parties' briefs, as well as in both evidentiary hearings, the evidence shows that the City of Cleveland, in cooperation with the Cleveland School District and the Vanguards of Cleveland have instituted aggressive minority recruitment efforts, including but not limited to targeting advertising to minorities (Dec. 19, 2012 Tr. at 32, 42, 46-47, 52, 53, 145, 152-53); maintaining lists of potential interested and/or qualified

-9-

individuals from the minority community for upcoming tests (Dec. 19, 2012 Tr. at 31, 44, 46-47, 146); providing tutoring to any interested applicant, but emphasizing minorities, in order to promote higher scoring on the written entrance exam (Dec. 19, 2012 Tr. at 31-32, 39, 49, 66-68); implementing a high school trade program for firefighting at MLK High School which has nearly 100% minority enrollment (Dec. 19, 2012 Tr. at 27, 148); giving significant preference points on the exam scoring to the MLK firefighting school graduates (Dec. 19, 2012 Tr. at 28, 119, 153-54; Ex. 93-C; 93-F); and, giving significant preference points on the exam to City of Cleveland residents. (Dec. 19, 2012 Tr. at 29, 120). Many of these efforts go above and beyond what was required by the 2000 amended consent decree, and all have remained in effect well after the 2008 expiration of that decree. (Dec. 19, 2012 Tr. at 30-31, 33, 66-68, 123, 153-54; Ex. 93-C; 93-F).

The evidence also shows, and the parties have not disputed, that further efforts to comply with the specific race-based hiring ratios set forth in the 2000 amended consent decree have been impossible due to unanticipated economic factors, Cleveland's population decline, and the reduced workforce needs of the Fire Department. The City has been prevented from hiring any new firefighters in more than a decade due in part to budget cuts and delayed retirements. (Dec. 19, 2012 Tr. at 54-55). The last firefighters hired were hired from an eligibility list that was based on the 1998 exam, (Dec. 19, 2012 Tr. at 54-55, 64), and the last fire academy was held in 2001. In 2004 and again in 2010 firefighters were laid off (Dec. 19, 2012 Tr. at 56), and a retention program (the "DROP" program) caused many firefighters who would otherwise have retired to stay in their current positions. To the extent that the City has been able to hire any firefighters since 2004, it has only been able to re-hire those who had previously been laid off.

The evidence further shows that had the Court extended the 2000 amended consent

-10-

decree until 2014 as suggested by the parties, the entire consent decree would have lasted 41 years past the complained of discrimination and would be affecting only applicants who had not even yet been born at the time the discrimination was found to have occurred. (Dec. 19, 2012 Tr. at 121). It would, therefore, be favoring minority candidates who have never faced discrimination by the Cleveland Fire Department, and would have a detrimental effect on non-minorities who had never benefitted from any discriminatory practices carried out by the City. (Dec. 19, 2012 Tr. at 155). In addition, there is no evidence that there is anyone left in the Cleveland Fire Department who was employed at the time of the original consent decree. Therefore, there are no individuals affected by the previous discrimination who will be positively affected by a continuation of 2000 amended consent decree.

There is also no evidence that any applicant would suffer any residual effects of the past discrimination. Much has changed since the early 1970s affecting the institutional composition of the City and its public safety forces. There are now minorities in the leadership of the Fire Department, in the Mayor's Office, and in the Civil Service Commission for the City of Cleveland who all have input in the testing, hiring, and recruitment of new firefighters. (Dec. 19, 2012 Tr. at 142-43). There is also an increased awareness of the need for diversity among the city leaders. There are organizations committed to advancing diversity and minority rights at all levels of government, in all employment arenas, and specifically in the public service arena. The evidence presented at the most recent hearing shows, even more specifically, that there are local and international organizations committed to representing the rights of minority firefighters and increasing minority participation in fire departments locally, nationally, and internationally. (Dec. 19, 2012 Tr. at 36). In the City of Cleveland there are aggressive minority recruitment and

-11-

training programs in effect that either primarily benefit minorities or are meant to equalize the chances of minorities to qualify for hire in the Fire Department. (Dec. 19, 2012 Tr. at 27-29, 31-32, 39, 42, 46-47, 49, 52, 53).

There has been absolutely no evidence of continued discrimination in the hiring practices of the Cleveland Fire Department. No individual or entity has complained that the current entrance exam or any other hiring criteria are discriminatory either in intent or in effect. (Dec. 19, 2012 Tr. at 120). There is evidence that the City will continue to preference City residents and MLK firefighting program graduates, and will continue to make serious efforts to recruit, prepare, and hire qualified minority candidates into the Cleveland Fire Department. (Dec. 19, 2012 Tr. at 30-31, 33, 66-68, 123, 153-54).

The most recent entrance exam was given on July 31, 2010. (Dec. 19, 2012 Tr. at 17, 55). The eligibility list for new hires based on this exam was established in January of 2011, and will expire on January 14, 2013. (Dec. 19, 2012 Tr. at 116). Prior to offering the 2010 exam, the City hired a professional consultant, and the mayor consulted with the prior fire chief, and the public safety department to determine how to weight the scores. (Dec. 19, 2012 Tr. at 116, 119, 142-43; Ambroz Aff. §2; ECF 84-2). The mayor and the prior fire chief are both minorities. (Dec. 19, 2012 Tr. at 142-43). In previous exam years the written and agility tests were given equal weight. (Dec. 19, 2012 Tr. at 119). For the 2010 exam, the consultations outlined above led to a change wherein the written exam became 60% of the final score, and the agility test accounted for 40% of the final score. (Dec. 19, 2012 Tr. at 119). The scoring was also changed by providing five additional points to graduates of the MLK firefighting program. (Dec. 19, 2012 at 119). The Vanguards were not consulted in determining the new preference points or

-12-

the new weighting calculations because the 2000 amended consent decree had already expired at the time the exam scoring issues were reviewed.  (ECF # 72, 73).  Even without any input from the Vanguards, however, the City implemented a new practice that was aimed primarily at benefitting minority candidates by adding the five preference points to the scores of the MLK firefighting program's graduates.[2]

The evidence shows that the firefighter's exam is very competitive.  A candidate who scores 95/100 has been ranked 806 out of the total pool of eligible candidates prior to the calculation of preference points.  (Ex. 93-E).  In fact, no one on the current eligibility list has rated high enough to receive a job offer without the addition of preference points either for being a City of Cleveland resident, or being a disabled veteran.[3]  (Ex. 93-D, 93-E).  Further, there is evidence that an MLK graduate who scored 95 on the exam placed 445 places higher on the final eligibility list than another candidate who scored 100, due to the fifteen preference points he received for being an MLK graduate and a City of Cleveland resident.  (Ex. 93-D, 93-E).  The non-minority, non-resident applicant who scored a perfect score on the exam cannot place high enough on the eligibility list to have a chance of being hired because he did not receive any

---

[2]

Although the MLK program is facially race neutral, as set forth above, it is available only to full time students at MLK high school.  The population of that school is nearly 100% minority.  Therefore, the opportunity to participate and eventually obtain these preference points is available to far more minorities than non-minorities, should the students choose to take advantage of this opportunity.  Only "five to six" of the approximately 500 graduates from the MLK firefighting program have been non-minority.  (Dec. 19, 2012 Tr. at 27).

[3]

Two hundred and ninety-seven of the top 300 candidates on the eligibility list received ten preference points for City residency.  Three received ten preference points for being a disabled veteran.  (Ex. 93-D, 93-E).  The post-hearing brief of the Vanguards and *Headen* Plaintiffs calculates that nearly fifteen percent more minorities receive City residency preference points than do non-minorities.  (ECF #98 at 5).

preference points.

The parties have submitted no evidence that any qualified, interested, minority candidate has been precluded or dissuaded from applying for, testing for, or being hired for the position of firefighter in the City of Cleveland since Judge Krupansky's original Order was issued in 1975. Nor is there any reason to expect that any such discrimination will occur if the 2000 amended consent decree is allowed to expire.[4]  The parties have also failed to submit any evidence that there remain any ramifications with regard to the hiring practices of the Cleveland Fire Department that are attributable to past discrimination practiced by the Department.  The only evidence presented that even attempts to prove continuing effects from prior discrimination is the testimony of the *Headen* Plaintiff's proffered expert witness, Dr. Mark Salling,[5] who testified

---

[4]

Chief Luke and Chief Brewington both testified that they hold a personal belief that the consent decree has been the impetus for the recruitment and educational changes that have been made.  This is an indication that the consent decree has in fact served a positive purpose by bringing these changes to light and highlighting the importance of prioritizing minority recruitment and diversity in employment at the Fire Department.  It is not, however, evidence that an extension of the 2000 amended consent decree is needed in the future to remedy past discrimination.  Chief Brewington also expressed a personal belief that society has not yet risen to the level where discrimination can be avoided without the oversight of judicial enforcement.  This too falls short of providing evidence that continued judicial enforcement of the 2000 amended consent decree is required to remedy past discrimination.  It is, rather, an expression of a personal fear of future discrimination based on Chief Brewington's experience and personal history that is understandable but not supported by the evidence presented in this case.  Further, it should be noted that judicial enforcement of the equal right guarantees of the United States Constitution is always an available remedy for any future discrimination, and as such, is itself a deterrent to future discrimination.  However, the fear of future discrimination does not justify the current imposition of race-based hiring criteria or "affirmative action" that itself violates the equal protection guarantees of the Constitution.

[5]

Although the Court will discuss the opinions rendered by Dr. Salling, and does accept that he has provided relevant information regarding the facts underlying his opinions, he does not qualify as an "expert witness" in this case.  Dr. Salling may qualify as an expert

that the percentage of minority firefighters in the Cleveland Fire Department is not equal to the percentage of minority 18-34 year olds in the general "relevant" population.  However, the percentage does not become equal even if the *Headen* hiring ratios are achieved, and even their expert acknowledges that this ratio would not be expected to be equal. (Dec. 19, 2012 Tr. at 112-113).

The numbers used by Dr. Salling in his analysis also do not comport with the stipulated actual numbers of applicants and minority applicants and exam takers in the 2010 test.[6]  The comparison made does not take into account any non-discriminatory factors that may account for the difference in ratios.  There has been no comparison of the ratio of interested minority individuals, minority applicants, minority exam takers, or minorities with passing scores to the ratio of those hired, nor has there been any evidence that these ratios differ from those within the

_____

in geography, demographics, and possibly even statistical analysis.  However, while these areas of expertise may shed light on the general context and make-up of the relevant community, they are not relevant to the base question of whether these statistical comparisons indicate any actual remaining ramifications of past discrimination by the Cleveland Fire Department, or whether there is any continuing discrimination being practiced by the Cleveland Fire Department.  Dr. Salling did not account for the effects of any of the many factors outside of discrimination by the Cleveland Fire Department that might affect whether minorities apply for, take, or receive passing grades on the firefighter entrance exam in numbers that are disproportionate to their representation in the general population of Cleveland.  The Cleveland Fire Department cannot be held accountable for remedying or addressing any and all of those potential factors, nor does it have the power to force minorities to apply for, study for, take, and pass the exam when it is offered.  Although Dr. Salling articulated what general ratios exist in the Department and in the City of Cleveland and surrounding areas, he made absolutely no determination as to what might cause these ratios to differ, nor does he have the expertise to do so.

[6]

In his report, Dr. Salling projects that 46.8% of all applicants for the 2010 exam would be minorities.  The parties have stipulated that 32% of the 2010 written exam takers were minorities, and 31% made it to the eligibility list.  According to other declarations by Dr. Salling, this is a statistically significant difference and it substantially skews his analysis.

non-minority hiring pool. There has been no evidence that minorities are not able to do as well on the written or physical exam, that the hiring criteria are skewed toward non-minorities, or that any qualified, interested candidates have been denied employment based either directly or indirectly on their race.

Dr. Salling testified that there has been sufficient time and turnover since the adoption of the original consent decree in 1977 to provide an opportunity to raise the percentage of minorities in the Cleveland Fire Department. (Dec. 19, 2012 Tr. at 89-90). He could not, however, answer whether past hiring discrimination has been eliminated. (Dec. 19, 2012 Tr. at 90). Instead he re-framed the question to determine whether the aspirational 33 and a third percent ratio articulated in the 2000 amended consent decree had been met.[7] This does not address the issue currently before the Court. The question before the Court is not whether that numerical ratio has been met: every entity associated with this case knows that it has not been. The question rather, is whether the continued judicial enforcement of a race-based hiring mandate instituted to achieve this ratio is necessary to remedy past discrimination in hiring by the Cleveland Fire Department.

Dr. Salling did not, and cannot answer this question simply by reviewing statistically significant differences between somewhat randomly chosen numbers that do not reflect or otherwise take into account the actual number of qualified, interested, and available minority candidates who have, or absent any alleged discrimination, would have taken advantage of the

---

[7]

The 33 and a third percent goal was not a mandatory requirement under the 2000 amended consent decree. This goal was set forth as a measure that, if achieved, would allow the 2000 amended consent decree to expire before three hiring cycles had been completed. It was not meant to be a reason for extending the duration of the 2000 amended consent decree.

opportunities existing for employment with the Cleveland Fire Department.   In fact, after outlining all of his various calculations, Dr. Salling admitted that he would not necessarily expect the general racial compositions he outlined and based his opinions upon to mirror the Fire Department workforce. (Dec. 19, 2012 Tr. at 112-113).

### Analysis

This court has discretion to determine whether and how a consent decree will remain in effect, including the discretion to terminate the decree altogether. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380 (1992). A consent decree's own terms relating to its duration and the projected need for possible extensions as set forth in the decree are relevant but not binding on this Court's decision. *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, No. 09-4208, at 6 (6th Cir. January 27, 2012).   This is particularly true when, as in this case, the consent decree affects the rights of persons beyond the immediate litigants. *Id.* at 7; *Heath v. DeCourcy*, 888 F.2d 1105, 1109 (6th Cir. 1989).

The Sixth Circuit has pointed out that when terminating jurisdiction over a consent decree, the Court should make "explicit findings concerning Defendants' compliance with the decree's goals and specific terms." *Gonzales v. Galvin*, 151 F.3d 526, 532 (6th Cir. 1998). Although the Court of Appeals has asked this court on remand to make explicit findings in compliance with *Gonzales*, it should be noted that this Court was never asked to terminate an on-going consent decree. Rather, the 2000 amended consent decree expired by its own terms on September 29, 2008. (ECF #22). Two of the parties subsequently sought an extension of the decree. (ECF #44, 45). A court has even greater discretion when deciding whether to extend an expired consent decree than it does when determining whether to terminate a decree that is on-

-17-

going, and the *Gonzales* factors do not necessarily apply. Nonetheless, the Court's decision to deny an extension of the 2000 amended consent decree satisfies all of the *Gonzales* factors, as will be shown below. Further, because the 2000 amended consent decree includes race specific classifications and hiring ratios, the Court must also determine whether these provisions remain constitutionally viable under the current circumstances and context in which the case exists today.

A. <u>Constitutionality of Race-Based Classifications in the 2000 Amended Consent Decree</u>

The Court has previously recognized in this case, as it did in *Rutherford v. City of Cleveland*, 1:94 CV 1019, which addressed similar allegations and findings of discrimination in the historical hiring practices of the City of Cleveland's Police Department, that race-based remedial hiring practices constituting "reverse discrimination" or "affirmative action" were approved by the United States Supreme Court as a necessary step toward creating greater equality when used in a limited and temporary fashion. However, the Sixth Circuit in reviewing the *Rutherford* case also noted that such remedies are disfavored if they "are not temporary and do not terminate when racial imbalances have been eliminated." *Rutherford v. City of Cleveland*, No. 04-3904, 2006 WL 1526091, at *12 (June 1, 2006). This, in fact, is an understatement of the law. In actuality, beyond being disfavored, if the race-based hiring practices contained in a consent decree do not withstand strict scrutiny, they are unconstitutional under the Equal Protection Clause as are any other racial classifications set forth in the law. *See Parents Involved in Community Schools v. Seattle School District No.* 1, 551 U.S. 701, 741 (2007); *Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994)(en banc). As the Circuit recognized in its opinion remanding this case , "[a]t most, the Constitution barely tolerates a public employer's decision to

-18-

hire or reject a job applicant based upon . . . race," and any such distinctions, even if allowed under the strict scrutiny standard, must be applied "only reluctantly, in circumstances limited in both scope and duration." *Cleveland Firefighters*, No. 09-4208, at 2.

To survive strict scrutiny, a racial classification must be narrowly tailored to achieve a compelling governmental interest. *Parents Involved,* 551 U.S. at 720. "[R]emedying the effects of past intentional discrimination" is a compelling interest. *Id.* However, to fall under this recognized compelling governmental interest, the state actor must not only show past discrimination, it must be able to show that the racial classification imposed actually serves to remedy that past discrimination. *Cleveland Firefighters*, No. 09-4208, at 8. Judge Krupansky made a finding of discrimination in this case in 1975. Therefore, past discrimination has been established. The question of whether the race-based classifications or hiring quotas set forth in the 2000 amended consent decree actually serve to remedy that past discrimination at this point in time is the primary question before the Court.

As the Sixth Circuit noted in its opinion remanding this case, the showing that discrimination will be remedied by imposing a race-based classification is often taken for granted and not articulated in the typical case. However, it cannot be assumed when the classification has already been applied for over thirty years and the parties seek a continuance that would extend it beyond the forty year mark. *Id.*; accord, *Gonzales v. Galvin*, 151 F.3d 526, 531 (6th Cir. 1998)(citing *Board of Educ. V. Dowell*, 498 U.S. 237, 248049, 112 L. Ed. 2d 715, 111 S. Ct. 630(1991))("Injunctive relief after a period of compliance should not extend beyond the time necessary to remedy the violation."). In fact, the Sixth Circuit has adopted the position taken by the Eleventh Circuit in *Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1575-76 (11th Cir.

-19-

1994), which effectively recognizes a presumption that after a passage of significant time,

(thirteen years in *Ensley* and over thirty years in this case), a district court should presume the

"'retrospective, remedial purpose of affirmative action satisfied except where it finds that past

discrimination continues to taint a particular position.'" *Cleveland Firefighters*, No. 09-4208, at

9 (quoting *Ensley*, 31 F.3d at 1575-76).

Based on the evidence presented at the 2009 hearing, the 2012 hearing, and in the

supporting briefs and evidence presented by the parties in connection with those hearings, this

Court finds that there is no evidence, let alone "strong evidence" as required by *Aiken*, 37 F.3d at

1163, that the 2000 amended consent decree's racial classifications remain remedial at this point

in time. The one in three minority hiring ratio no longer serves to remedy past discrimination by

the Cleveland Fire Department. As set forth above in the Court's findings of fact, there is

absolutely no evidence whatsoever that there is continuing discrimination in the hiring practices

of the Fire Department. There have been no challenges by any party, or any third-party to the

most recent entrance examination (Dec. 19, 2012 Tr. at 120); there are no allegations, let alone

evidence, that any qualified minority candidate has been overlooked based on their race since the

original  consent decree went into effect; there is an abundance of evidence that the City has gone

out of its way to recruit, tutor, encourage, and assist minority candidates in applying for and

passing the entrance examination (Dec. 19, 2012 Tr. at 27-34, 39, 42, 46-47, 49, 52, 53, 66-68,

119-120, 123,  145-146, 148, 152-54); the City has in effect a resident preference that in all

practicality precludes non-residents (who constitute a higher non-minority population) from

making it onto the hiring eligibility list (Dec. 19, 2012 Tr. at 29, 120, Ex. 93-D, 93-E); the City

has helped to establish a firefighting program at MLK high school, which has nearly total

-20-

minority enrollment (Dec. 19, 2012 Tr. at 27, 148); the City has voluntarily provided preference

points to the graduates of the MLK firefighting program (Dec. 19, 2012 Tr. at 28, 119, 153-54);

there are a significant number of minorities in leadership positions with the City, the Public

Safety Department, and the Fire Department who have influence on the hiring practices of the

Cleveland Fire Department (Dec. 19, 2012 Tr. at 142-43). Further, there has been a substantial

increase in the percentage of minority uniformed firefighters in the City of Cleveland, rising from

4% at the time of the initial filing of the lawsuit to a steady 26% over the last twelve years. (ECF

#99). Finally, the evidence also shows that the percentage of minority candidates taking the most

recent exam who made it on to the hiring eligibility list is 70%, only 4% lower than the overall

percentage of eligible candidates taking the test. (ECF #99).[8] A 4% difference between the

overall eligibility rate of exam takers and the minority eligibility rate is not strong evidence of

any discriminatory intent or effect arising from the exam or the scoring methods currently

implemented by the City.[9] All of these factors combine to compel a finding that there is no

---

[8]

The parties' stipulations indicate that of the 1884 individuals taking the exam, 1403 names
made it to the hiring eligibility list. Of those taking the exam 609 were minority candidates
and 429 of those minority candidates made the eligibility list.

[9]

Any larger discrepancy that may exist between the ratio of minorities to non-minorities in
the general population of the relevant community and the ratio of minorities who actually
choose to take the exam sheds no light on whether the exam and scoring procedures
themselves have a discriminatory effect. As the original finding of discrimination was
based on the effect of the exam and other scoring factors, determining whether this type of
discrimination continues requires consideration of how minorities do on the exam in
comparison to the overall pool of test takers, not whether or not minorities for whatever
reason choose to take or refrain from taking the exam in the first place. This is especially
true when all parties have presented evidence that the City's recruitment efforts
encouraging minority participation in the exam taking process have been extraordinary and
above reproach.

-21-

evidence, let alone strong evidence, of any discrimination by Cleveland's Fire Department with regard to their hiring practices, exam content, or scoring methods.

Further, there is no evidence that continuing the race-based classifications and hiring ratios will remedy any on-going effects of past discrimination. The increase from 4% to 26% minority representation within the Fire Department (notwithstanding that hiring efforts have been unavoidably stalled for nearly a decade), combined with the presence of minority leadership in the City and in the Fire Department itself,[10] as well as the existence of organizations committed to increasing minority participation in the firefighting industry, have eliminated any long term effects of the prior lack of minority representation in the department on future hiring decisions. (Dec. 19, 2012 Tr. at 36, 142-43). The evidence has also made clear that due to age restrictions in the hiring criteria of firefighters (a restriction not challenged by any of the parties) there cannot possibly be anyone eligible for hire from this date forward who was personally affected, positively or negatively, by any of the prior discrimination addressed by the original lawsuit. (Dec. 19, 2012 Tr. at 121). In addition, there are no longer any employees in the Cleveland Fire Department who were employed there at the time the original consent decree was put in place. Therefore, there are no current employees in the department who have been either positively or negatively affected by any prior discrimination as alleged in the original lawsuit.

For all of these reasons, the Court finds that there is simply no evidence that would support the conclusion that a continuation of the 2000 amended consent decree would serve to

---

[10] In fact, two of the primary witnesses at the most recent evidentiary hearings, Chief Luke and Johnny Brewington were minority firefighters who had achieved the rank of "Chief," and who were committed to the on-going recruitment of minority firefighters. Further, the current Cleveland Mayor is a minority as are the majority of the City Council members.

remedy past discrimination by the Cleveland Fire Department. Rather there is an abundance of evidence to suggest that any past discrimination by the Fire Department in its hiring practices has been eliminated, and there is no continuing impact arising from that past discrimination on any current or future employees, or in the hiring process itself. Therefore, the race-based hiring ratios contained in the 2000 amended consent decree are not narrowly tailored to address a compelling governmental interest, cannot pass strict scrutiny, and are unconstitutional under the Equal Protection Clause of the United States Constitution.

B. Continuation of Race Neutral Provisions of the 2000 Amended Consent Decree

The Sixth Circuit case of *Gonzales v. Galvin*, 151 F.3d 526 (6th Cir. 1998), sets forth the criteria a court should consider when determining whether to terminate a consent decree that has not expired on its own terms. Although, as mentioned above, this case does not involve the early termination of a consent decree, but rather a request to extend the terms of an already expired decree, even the higher threshold requirements for termination under *Gonzales* would be satisfied in this case. *Gonzales* instructed that a district court should consider the following factors when deciding whether to terminate a consent decree: (1) any specific terms providing for continued supervision and jurisdiction over the consent decree; (2) the consent decree's underlying goals; (3) whether there has been compliance with prior court orders; (4) whether defendants made a good faith effort to comply; (5) the length of time the consent decree has been in effect; and, (6) the continuing efficacy of the consent decree's enforcement. *Id.* at 531. Notwithstanding these factors, *Gonzales* held that a district court may not terminate its jurisdiction until it finds that the Defendants are in compliance with the decree's terms, and that the decree's objectives have been achieved. The reasoning behind this edict is to give effect to

-23-

the parties agreement and ensure that the bargained for results are achieved. *Id.* (citing *Jansen v. City of Cincinnati*, 977 F.2d 238, 241 (6th Cir. 1992). This must be somewhat tempered, however, when the parties' agreement has a significant negative effect on third parties who did not join in the agreement. As indicated above, in this case, none of the individuals who would now be affected by a continuation of the 2000 amended consent decree were parties to, or even impacted by the original litigation and consent decree. Further, as the new eligibility list was created based on a 2010 exam, many of the individuals who will be impacted by this Court's decision were not involved with or represented in the negotiations leading to the 2000 amended consent decree.

When originally faced with the question of whether to extend the 2000 amended consent decree, this Court considered preliminary briefing, held an evidentiary hearing, and requested additional briefing on whether a continuation of the 2000 amended consent decree was necessary to achieve the goals originally sought by the parties. All parties disregarded that request, submitting instead an agreement to extend portions of the 2000 amended consent decree for another six years, through December 31, 2014. The evidence presented in the first hearing, the briefs submitted on remand, and the evidentiary hearing held in December all lead to the conclusion that the goals of the original consent decree and of the amended consent decrees have all been satisfied and no further extensions are warranted. At least five of the six factors the court has been instructed to consider under *Gonzales* weigh heavily in favor of a finding that the parties have indeed complied, to the best of their abilities, with the terms of the 2000 amended consent decree; and, all evidence suggests that further enforcement of the decree is unlikely to have any substantive effect in furtherance of the goals and issues addressed therein. The first

-24-

factor has little to no weight under the current circumstances, but it would also weigh, if at all, in favor of terminating the decree.

Looking at the first *Gonzales* factor, the 2000 amended consent decree does specify that if the Fire Department does not achieve 33 and one third percent minority representation, or if it does not complete three hiring cycles implementing the one in three minority hiring ratios, the Court shall extend the decree for a reasonable time. As discussed above, however, the imposition of a race-based hiring quota does not withstand constitutional scrutiny, and is unenforceable. As noted by the Sixth Circuit in its opinion remanding this case, the Constitution clearly trumps any provisions set forth in a consent decree. Therefore, any time line that is based on the fulfillment of the race-based ratios is unenforceable and cannot provide weight in favor of continuation under *Gonzales*' first factor.

With regard to the race neutral requirements of the 2000 amended consent decree, there are no specific time lines or expiration dates set by the terms of the agreement. Although a review of the entrance exam was to have taken place by January 1, 2008, there are no provisions for extending the 2000 amended consent decree based on a failure to meet this deadline. Further, the decree specifically states that any recommended changes would not take effect until after the termination of the *Headen* decree. Therefore, it does not appear that Judge Manos or the parties contemplated that any changes in the exam would be subject to court supervision under the 2000 amended consent decree, and the parties have not argued that the decree contemplated a continuance of the recruitment requirements for any particular duration. Factor one, therefore, if it has any weight at all, would tend to support the Court's refusal to extend the 2000 amended consent decree with regard to the race neutral requirements of the agreement.

-25-

With regard to the second factor, the Court finds that there is strong evidence that the underlying goal of the 2000 amended consent decree, and all of its previous iterations,  was to eliminate race discrimination in the hiring of Cleveland firefighters, and to remedy the effects of any past discrimination.  As discussed in more detail in the constitutionality discussion set forth above, there is no evidence whatsoever of any on-going discrimination, or of any remaining impact from past discriminatory practices on current candidates or current employees of the Cleveland Fire Department.  More specifically, the original consent decree was implemented to address the Court's Order requiring a review of the entrance exam, additional minority recruitment efforts, the provision of preference points to City of Cleveland residents, and the implementation of non-discriminatory screening procedures in the hiring process for firefighters. *See Headen v. City of Cleveland*, No. C73-330 (N.D. Ohio Apr. 25, 1975).

As of December 19, 2012 the evidence shows that the entrance examination has been reviewed by the City and outside consultants, and that changes resulting from this review were implemented in the 2010 exam.  (Dec. 19, 2012 Tr. at 119, 142-43; Ambroz Aff. §2).  The evidence further shows that the City has made outstanding advances in minority and general recruitment practices and the Fire Department continues to dedicate extraordinary amounts of time and resources to continuing these recruitment efforts despite the expiration of the 2000 amended consent decree.  (Dec. 19, 2012 Tr. at 20-22, 27-29, 30-33, 38-39, 41-42, 46-47, 49, 52, 53, 55, 64-68, 146-48).  There is no dispute that the Cleveland resident preferences points have been made available, and that they, in fact, are crucial to obtaining a high enough spot on the eligibility list to obtain an employment offer.  (Dec. 19, 2012 Tr. at 29, 120; Ex. 93-D; 93-E). Finally, there has absolutely no evidence presented that there remain any discriminatory

screening procedures in the hiring process for Cleveland firefighters.  All evidence supports a finding that the goals of the 2000 amended consent decree have been achieved and the issues addressed by the original and only Court Order identifying discrimination by the Cleveland Fire Department have been fully resolved.  Factor two, therefore, weights heavily in favor of allowing the 2000 amended consent decree to expire as originally planned in September 0f 2008.

There is also ample evidence that the City of Cleveland has, to the extent possible, complied with all prior court orders, including the requirement of reinvigorating the prior recruitment and training efforts for the entry level position of firefighter (Dec. 19, 2012 Tr. at 31-32, 44, 42, 46-47, 52-53, 145-146, 152-53); reviewing the exam substance, scoring, and weighting of future exams (Dec. 19, 2012 Tr. at 119, 142-43; Ambroz Aff. §2);[11] implementing a specific educational program to train students at the MLK high school in firefighting and other public service careers (Dec. 19, 2012 Tr. at27, 148); making concerted efforts to increase minority recruitment and tutor or otherwise assist potential candidates to prepare for the firefighting exam (Dec. 19, 2012 Tr. at 31-32, 39, 49, 66-68); and, providing significant preference points to City of Cleveland residents to increase their rank on the eligibility list, (Dec. 19, 2012 Tr. at 29, 120).  Further, no party has challenged that other aspects of the decree were fully complied with, including but not limited to re-scoring the written portion of the 1999 exam; paying attorney's fee for the Plaintiffs; negotiating with Vanguard and the other Plaintiffs to

---

[11]

Although there is no evidence as to whether this was completed by the January 2008 deadline, the exam was re-evaluated using a professional consultant prior to the issuance of the first exam following the expiration of the *Headen* ratios.  This would have been the first allowable time to implement any changes to the exam pursuant to the terms of the 2000 amended consent decree.

reinvigorate the existing recruitment and training efforts (ECF #33, Dec. 19, 2012 Tr. at 39-40); and, maintaining the existing method of assigning seniority to persons on the eligibility list.

Where compliance has been made impossible by unforeseen economic factors, as in the City's failure to complete three hiring cycles by September 29, 2008, the City has made good faith efforts to comply. They conducted one hiring cycle utilizing the *Headen* ratios and when hiring was stalled due to economic factors, made extreme efforts to extend and protect the eligibility list that included the *Headen* preferences. (ECF # 44). Therefore, factors three and four also weigh heavily in favor of allowing the expiration of the 2000 amended consent decree.

The original consent decree and its two amendments have imposed race-based hiring ratios and other affirmative requirements on the City for nearly forty years. If extended the parties seek to have the decree in effect for over forty years in total. The parties have suggested that this may be the longest running consent decree in history, and more importantly, because of the passing of time, the decree has absolutely no effect on any individual who was impacted by the original discrimination. Rather, the parties now seek to have it applied to individuals who were not even born at the time the original lawsuit was filed.

The consent decree has been allowed to continue for nearly forty years without a single showing of on-going discrimination or any proof that a single interested candidate was kept from employment based on their minority status or the effects of prior discrimination since the filing of the lawsuit in 1973. Nonetheless, an extension of the 2000 amended consent decree would create a disadvantage for some non-minority candidates who have never received any benefit from prior discriminatory practices, but are nonetheless being prevented from obtaining employment based solely on the basis of their own race.

-28-

There can be absolutely no doubt that significant changes have occurred in society, in the City and its leadership, and in the Fire Department itself that have eliminated many of the causes of the prior discrimination by the Cleveland Fire Department.  Although some may argue that trends and circumstances in our society still limit the opportunities for minorities, there is absolutely no evidence that the Cleveland Fire Department has done anything over the last thirty plus years other than encourage and assist minority candidates who are interested in a career in firefighting.  There is no evidence that minorities have anything less than an equal opportunity to pursue a career with the Fire Department, and the evidence suggests, in fact, that even without the *Headen* ratios in place they may have a greater opportunity than non-minority candidates through the establishment of the MLK firefighting program and the preference points offered to its graduates and to Cleveland City residents.  Whether they take advantage of these opportunities is not a matter that is within the control of the Cleveland Fire Department, nor is that an issue that can be, or should be addressed by the terms of a consent decree.

The Cleveland Fire Department has increased from 4% minority representation in 1973 to 26% representation in 2000.  The 26% representation has remained level for over a decade now. Despite what can only be seen as extraordinary efforts to engage and nurture a larger pool of minority candidates over the course of the last thirty years, there is no indication that minority applications for the position of firefighter have increased over that time.  At the latest exam, just over 35% of the applicants were minorities, and only 32% of the people who actually took the exam were minorities.   This is compared with Dr. Sallings's demographic finding that 60% of the age eligible community in the City of Cleveland are minorities.  Taking into account the broad and comprehensive recruiting efforts made by the City of Cleveland; the free tutoring

programs sponsored by the City aimed at enhancing exam scores; the establishment of a

firefighting program at the nearly exclusively minority high school; the preference points given

to Cleveland City residents on the exam; the highly competitive nature of the exam; and the five

point preference given to the MLK program graduates, the 32% minority turn out rate for the

latest exam leads to the conclusion that nothing within the control of the City of Cleveland,

including a heightened degree of recruitment, tutoring, training, or preference points has been, or

likely will be effective in luring a population proportionate number of minority candidates to sit

for and pass the firefighters exam. This further leads to the conclusion that the sixth factor of the

*Gonzales* test weighs against the continuation of the 2000 amended consent decree, as there is no

evidence that would suggest an extension would increase the efficacy of the decree or further

advance its goals.

Based on all of the facts presented at the evidentiary hearings, all of the evidence

submitted in support of the parties briefs, and a review of all of the relevant law, this Court finds

that the City of Cleveland has substantially complied with the terms of the 2000 amended

consent decree in all aspects except for a full implementation of the race-based hiring ratios

originally contemplated in the 2000 amended consent decree. For the reasons set forth above,

further use of these ratios under the current circumstances would be unconstitutional under the

Equal Protection Clause of the United States Constitution. They are, therefore, unenforceable

provisions and cannot be said to prevent a finding of full compliance. This Court further finds

that the decree's objectives have been achieved in so far as there is no evidence of continuing

discrimination in the hiring practices of the Cleveland Fire Department and there is no evidence

of any continuing repercussions resulting from the prior discrimination outlined in the 1973

-30-

complaint and the 1975 Court Order which gave rise to the original consent decree and its future amendments.[12]  For these reasons, the requests for extension of the 2000 amended consent decree are denied.

## Conclusion

For the reasons set forth above, this Court finds that the 2000 amended consent decree in the above captioned litigation is no longer necessary to advance the goals of that decree, and that the City has substantially complied with all enforceable terms of the decree.  The race-based provisions are no longer needed to address past discrimination and are, consequently, unconstitutional. Therefore, the City's Motion for Extension of Time to Comply with the Headen Decree (ECF #44), the Vanguards of Cleveland's Motion to Extend the Terms of the Second Amended Consent Decree (ECF #45), and the Vanguards renewed Motion to Extend (ECF #83) are denied.  This case is terminated.  IT IS SO ORDERED.

DONALD C. NUGENT
United States District Judge

DATED: January 8, 2013

---

[12]

There is no reason to believe, based on the evidence presented that the City will not continue in its efforts to promote racial diversity in the Fire Department or that it will discriminate in any way in its future recruitment and hiring practices.  However, even if future discrimination remains a fear by some of the parties to this litigation, the continued enforcement of the 2000 amended consent decree is not justified by the fear of future discrimination.  Racial classifications such as those contained in the 2000 decree can only be tolerated when they offer redress for past discrimination, they are not allowable as a preventative measure taken as insurance against potential future harms.

-31-